**A. L. HOLDEN, Irene J. Kozly, Robert M. Paisley, Robert J. Paisley and Kraig Sim, co-partners, doing business under the name and style of R. L. Pritchard & Company**

v.

**S/S KENDALL FISH, her engines, boiler, etc., and Lykes Bros. Steamship Company, Inc.**

No. 4233–B.

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 30, 1966.

Henry J. Read, Montgomery, Barnett, Brown & Read, New Orleans, La., Hill, Rivkins, Middleton, Louis & Warburton, New York City, for libellants.

Benjamin W. Yancey, Terriberry, Rault, Carroll, Martinez & Yancey, New Orleans, La., for respondents.

HEEBE, District Judge.

Between May 11th and May 28th, 1952, Tanganyika Sisal Marketing Association, Ltd., delivered to respondent, at various ports in Tanganyika, a total of 5835 bales of sisal for carriage aboard the Kendall Fish to New Orleans, covered by various bills of lading. Each of the bales had an actual value at all times of less than $500.

Libellant, Pritchard & Company, pursuant to a contract with General Services Administration (hereafter, "GSA"), purchased the sisal above-mentioned from Tanganyika Sisal, receiving the bills of lading covering the shipment. Before the arrival of the S/S Kendall Fish at New Orleans, libellant sold the sisal and endorsed and transferred the bills of lading covering same to GSA.

On arrival in New Orleans, the Kendall Fish did not deliver the sisal in the same good order and condition in which it was delivered aboard said vessel: 89 bales were found to be missing and 35 others damaged.

The cargo underwriters paid GSA for the loss and damage according to the value of the sisal as stipulated in the invoices and thereafter caused this proceeding against the carrier to be initiated in the name of R. L. Pritchard & Co. as their agent and representative.

This Court previously found the carrier liable for the loss and damage above-mentioned, 212 F.Supp. 106 (1962), but at that time we restricted our decision to the issue of liability and ordered that the issue of the measure of damages be submitted to a Master. The Master has since returned his report and the libellants, representing the cargo interests, have excepted to his determination of damages; respondent has moved that the Master's determination be confirmed.

Libellants (hereafter "cargo") attempted to introduce before the Commissioner the following provision, contained in the bill of lading covering the sisal shipment, as evidence of the extent of damage to cargo:

"Whenever the value of the goods is less than $500.00 per package or other freight unit, their value in the calculation and adjustment of claims for which the carrier may be liable shall for the purpose of avoiding uncertainties and difficulties in fixing value be deemed to be the invoice value, plus freight and insurance if paid, irrespective of whether any other value is greater or less."

Based on the invoice value of the lost and damaged bales, cargo's claim for damage would have been $20,027.73. The Master, however, refused to admit the quoted provision into evidence, and found that the loss sustained should be calculated upon the actual market price of the sisal at the time and place of delivery, or $7,656.84. The question for our determination is simply which of these two valuations is correct.

In the absence of a clause in the bill of lading to the contrary, the basis for fixing damages for cargo loss is the market price of the cargo at the place of destination, in like condition as when it was shipped, on the date when it should have arrived. The Ansaldo San Giorgio I v. Rheinstrom Bros. Co., 294 U.S. 494, 496, 55 S.Ct. 483, 79 L.Ed. 1016 (1935); St. Johns N. F. Shipping Corp. v. S. A. Companhia Geral, etc., 263 U.S. 119, 125, 44 S.Ct. 30, 68 L.Ed. 201 (1923). This has held true under the Carriage of Goods by Sea Act, 46 U.S.C.A. §§ 1300–1315 (hereafter, "Cogsa"), Atlantic Mutual Ins. Co. v. Poseidon Schiffahrt, 313 F.2d 872, 875 (7th Cir. 1963). Before Cogsa was enacted, it was common for the bill of lading to stipulate for "invoice plus disbursements" as the measure of loss. Gilmore & Black, The Law of Admiralty, p. 167. Such stipulations were classified by the courts as of two types: "true limitation" and "true valuation" agreements. With certain qualifications, both were held valid before Cogsa. The Ansaldo San Giorgio I, supra; Smith v. The Ferncliff, 306 U.S. 444, 59 S.Ct. 615, 83 L.Ed. 862 (1939).

With the enactment of Cogsa, the validity of both types has become questionable. Both have been held to be unenforceable by the carrier where they result in a measure of damages based on a value less than the market price at place of destination. American Trading Co. v. Steamship Harry Culbreath, 1952 A.M.C. 1170 (S.D.N.Y.1951); Otis McAllister & Co. v. Skibs, 260 F.2d 181 (9th Cir. 1958). In the Otis case the Court reasoned properly that § 3(8) of Cogsa, which states that "Any clause

\* \* \* lessening [carrier's] liability otherwise than as provided in this chapter, shall be null and void \* \* \*," renders ineffectual any type of clause under which carrier is liable for damages less than those computed on the fair market value of the goods at destination.

Since, as the Master noted (Commissioner's Report, p. 5), the invoice value is rarely greater but often less than the market price at destination, no case reported has involved the type of situation presented here, where the invoice value increases the liability of the carrier rather than decreasing it.

§ 5 of Cogsa states:

"A carrier shall be at liberty to surrender in whole or in part all or any of his rights and immunities or to increase any of his responsibilities and liabilities under this chapter \* \* \*" 46 U.S.C.A. § 1305.

Thus cargo would have us believe that, although carrier cannot decrease his liability for damage below that based on fair market value at place of destination, he can nevertheless increase it above that amount.

§ 4(5) of the Act, however, states in part:

"In no event shall the carrier be liable for more than the amount of damage actually sustained." 46 U.S.C.A. § 1304 (5).

Cargo argues that since the valuation clause was inserted in the bill of lading by carrier for its own benefit, carrier should not be allowed to disclaim the clause merely because it works against carrier in this instance. Such a position overlooks the fact that if § 4(5) of Cogsa does in fact prohibit the carrier from agreeing to liability for more than damages actually sustained, then carrier may not be held estopped from denying the validity of such an agreement simply because he does enter into one. Moreover, the fact is that the clause in the bill of lading before us can never work in carrier's benefit since, as we have seen, § 3(8) of the Act prohibits carrier from thus lessening its liability.

Cargo wishes us to solve the apparent contradiction between § 5 and § 4(5) by the following argument: Cogsa, unlike the Harter Act which simply forbids the inclusion of certain provisions in bills of lading, provides that every bill of lading covering shipments under Cogsa shall be deemed to include Cogsa's provisions. 46 U.S.C.A. § 1302. Thus, argues cargo, when Cogsa states in § 4(5) that "In no event shall the carrier be liable for more than the amount of damage actually sustained," this is simply a provision which is deemed to be part of every bill of lading, but that § 5 allows the carrier to "surrender in whole or in part all or any of his rights and immunities \* \* \* under this chapter," including the particular right granted under § 4(5).

The fallacy in this argument is apparent when § 4(5) is viewed in its entirety. That section begins by providing that the carrier shall not be liable for damages in excess of $500 per package; it then states that a greater maximum may be fixed by agreement by the parties but that "In no event shall the carrier be liable for more than the amount of damage actually sustained." A full view of § 4(5) indicates that the sentence quoted is not a mere provision deemed to be included in the bill of lading and which can be abrogated by the carrier, but that it is a definite command that, *although the carrier can agree to a higher maximum, he cannot agree to be liable for more than damage actually sustained.* We cannot accept cargo's position that § 5 allows the carrier to skirt so easily this clear and positive command. The first provision of § 4(5) allowing carrier to agree to a higher maximum than $500 per package is actually a particular application of the general provisions of § 5. That this repetition of the thrust of § 5 is followed immediately by the absolute language quoted, barring carrier from agreeing to liability for more than "damage actually sustained," is conclusive of the Congressional intent to supersede the general provisions of § 5.

Section 4(5) must, then, be read as an exception to the general intendment of § 5 and that, while carrier is allowed under § 5 to take on greater responsibilities and liabilities, he cannot increase the monetary measurement of the damage for which he thereby becomes liable. Thus, for example, while carrier may agree to take on the added responsibility of being liable for errors of navigation or management (for which he is not generally liable under Cogsa), carrier may not agree to be held liable for a greater amount than the damage actually caused by such errors.

Concluding, then, that § 4(5) governs this case, and that carrier may not be held liable for more than "the amount of damage actually sustained," the question remains: what is "damage actually sustained?" This Court, without any hesitation, answers: damage computed on the basis of the fair market value of the goods at destination as of the date of arrival. The only consistent meaning of the phrase "damage actually sustained" as used in the Act must be damage sustained in the course of the voyage and under the control of the carrier. To hold the carrier liable for "damage" caused, for example, by a fall in the price level of the shipped goods between the place of shipment and the destination would be to completely misread the plain meaning of the words used, and to place on the carrier the added burden of being an insurer against a fall in the market, despite the command of § 4(5) that the carrier not be liable for more than the amount of damage actually sustained. As Justice Holmes said in an analogous situation: "The rule of the common law [whereby the basis of damages is fair market value of the goods at destination] is not an arbitrary fiat but an embodiment of the plain fact that *the actual loss caused by breach of a contract is the loss of what the contractee would have had if the contract had been performed * * *.*" Chicago, Milwaukee & St. Paul Railway Company v. McCaull-Dinsmore Company, 253 U.S. 97, 99, 100, 40 S.Ct. 504, 505, 64 L.Ed. 801 (1920).

In the *Otis* case, supra, the Court held that where § 3(8) of Cogsa prohibited the carrier from "lessening his liability" under the Act, this meant that where carrier's liability is clear, carrier cannot secure an agreement that it will be liable for less than damage as computed on the basis of fair market value at place of destination. If "lessening liability" means being liable for less than damage computed upon the fair market value at place of destination, then "being liable for more than damage actually sustained" must, if only to maintain consistency in the Act, mean liability for more than damage computed on the basis of the same fair market value at destination. To hold that the parties could stipulate what "actual damages" are, would be to tamper with the word "actual." *Agreed* damages cannot, except by coincidence, be *actual*.

In *Otis*, the Court recognized that in § 3(8) of Cogsa the reference to "liability" (to lessen which the carrier was forbidden) was to liability as it was under the general maritime law. The Court stated that "What Cogsa does is restore the basis of recovery for the usual carriage of goods to the value at the point of destination as it was at common law * * *." 260 F.2d at 183. There is no reason to suppose that the reference point is different in § 4(5) merely because the Act speaks in favor of carrier instead of cargo.

Cargo argues that agreed damages—based on the invoice value of the cargo insofar as that value corresponds to the market value of sisal prevailing in Tanganyika—were in fact the actual damages sustained here by cargo since, by Act of Congress and their contract with Pritchard & Co., GSA was bound to buy its sisal in Tanganyika and was restrained from buying sisal in New Orleans, the port of destination, even to replace that which was lost in shipment. The argument is not on point. GSA had already fulfilled its duty under the Act, the contract had been struck, and the sisal bought. The Act certainly cannot be construed to insure that, if the sisal

was subsequently lost through the fault of a third party—carrier here—that the third party would also be bound to buy replacements in Tanganyika. As far as the third party, carrier, is concerned, the damages for which he may be held liable can only be measured at the actual replacement value of the cargo lost, based on the fair market value of that cargo at destination.

Libellants' exceptions are overruled and the Commissioner's report is confirmed. Libellants are entitled to recover of respondents the sum of $7,656.-84. The Master's fee is hereby fixed at the sum of one thousand dollars ($1,-000.00).

■ By reason of the fact that respondent was at all times willing and ready to pay the sum recovered, whereas libellants refused to consider anything other than invoice value as a basis of recovery and, by refusing to stipulate as to any value other than invoice value, forced the submission of the case to the Master for determination of market value, delaying the date of the Court's judgment, it is the judgment of the Court that libellants are not entitled to interest from date of demand, but only from date of judgment, and that libellants bear the burden of the Master's fee as fixed herein.